ERNEST VAN SKIKE v. DARIUS C. POTTER ET AL.

FILED DECEMBER 9, 1897. No. 7667.

1. Physicians and Surgeons: CONTRACTS WITH PATIENTS: EVIDENCE. The evidence examined and *held* to sustain the findings of the jury that defendants did not contract with plaintiff to effect for him a permanent cure; did not contract to visit and treat him until he was cured; that defendants were not guilty of negligence in the treatment given the plaintiff nor in adopting and pursuing the method of treatment followed by them.

2. ——: DEGREE OF SKILL REQUIRED. The law does not require of a surgeon absolute accuracy either in his practice or his judgment. It does not hold him to the standard of infallibility, nor require of him the utmost degree of care or skill, but that in the practice of his vocation he shall exercise that degree of knowledge and skill ordinarily possessed by members of his profession.

3. ——: MALPRACTICE: PLEADING AND PROOF. A petition alleged that defendants agreed to visit and treat plaintiff until he recovered. The answer was a general denial. The defendants were permitted to testify that, at the date of their last visit to plaintiff, they informed him that they should not return unless they should be requested so to do; that they received no such request and did not revisit plaintiff. *Held,* That this evidence was relevant under the pleadings.

4. Jurors: QUALIFICATION: EXAMINATION. In a suit against a surgeon for damages for alleged negligence in operating upon and treating plaintiff's fractured kneecap, the district court refused to permit persons called as jurors to answer, on their *voir dire* examination, whether they were members of any church organization or secret

society. *Held,* That it does not appear, nor can it be inferred from any fact in the record, that the district court abused its discretion or erred in its ruling in this matter.

5. ——: ——: ——. A litigant has the right to examine a person called as a juror for the purpose of ascertaining whether or not there exist grounds for challenging such person for cause; but what questions may be asked such a person, or what range or scope such an examination may take, is a matter committed to the sound discretion of the trial court; and its ruling will not be disturbed unless there has been an abuse of discretion to the prejudice of the party complaining.

6. ——: ——: ——. A juror's *voir dire* examination set out in the opinion, and *held* that the district·court did not err in overruling the plaintiff's challenge lodged against him on the ground of his bias and prejudice.

7. **Physicians and Surgeons:** MALPRACTICE: EVIDENCE. In a suit for damages against a surgeon for alleged negligence in operating upon and treating plaintiff's fractured kneecap, text-books on surgery, though standard authority on the subject, cannot be read to the jury as independent evidence of the opinions and theories therein expressed or advocated.

ERROR from the district court of Seward county. Tried below before WHEELER, J. *Affirmed.*

The opinion contains a statement of the case.

*F. I. Foss, J. D. Pope, Biggs & Thomas,* and *W. R. Matson,* for plaintiff in error:

Defendants did not plead that they were discharged. Evidence that the physicians were discharged is not admissible under a general denial. (1 Ency. Pl. & Pr. 849, 850; *Burlington & M. R. R. Co. v. Kearney County,* 17 Neb. 511; *Peet v. O'Brien,* 5 Neb. 362; *Haggard v. Hay,* 13 B. Mon. [Ky.] 175; *Clark v. Finnell,* 16 B. Mon. [Ky.] 329; *Francis v. Francis,* 18 B. Mon. [Ky.] 57; *Curtis v. Richards,* 9 Cal. 33; *Schenk v. Evoy,* 24 Cal. 104; *Lewis v. Coulter,* 10 O. St. 451; *Atchison & N. R. Co. v. Washburn,* 5 Neb. 125; *City of Lincoln v. Walker,* 18 Neb. 244; *Quick v. Sachsse,* 31 Neb. 312; *City of South Omaha v. Cunningham,* 31 Neb. 316; *Smith v. Wigton,* 35 Neb. 460; *Staley v. Housel,* 35

Neb. 160; *Powder River Live Stock Co. v. Lamb*, 38 Neb. 340; *Dinsmore v. Stimbert*, 12 Neb. 434.)

Standard books on medicine and surgery were erroneously excluded from the evidence. (Code of Civil Procedure, sec. 342; *Sioux City & P. R. Co. v. Finlayson*, 16 Neb. 578; *McCandless v. McWha*, 22 Pa. St. 261; *Carpenter v. Blake*, 60 Barb. [N. Y.] 488; *Bowman v. Woods*, 1 Greene [Ia.] 441.)

The court erred in refusing to require jurors upon their *voir dire* to answer questions as to membership in secret societies and church organizations. (12 Am. & Eng. Ency. Law 350; *City of Boston v. Baldwin*, 139 Mass. 315; *Commonwealth v. Moore*, 143 Mass. 136; *Donovan v. People*, 28 N. E. Rep. [Ill.] 964; *Lavin v. People*, 69 Ill. 303; *Monaghan v. Agricultural Fire Ins. Co.*, 18 N. W. Rep. [Mich.] 797; *Pinder v. State*, 8 So. Rep. [Fla.] 837; *Pearcy v. Michigan Mutual Life Ins. Co.*, 111 Ind. 59; *People v. O'Neill*, 16 N. E. Rep. [N. Y.] 68; *People v. Keefer*, 56 N. W. Rep. [Mich.] 105; *Owens v. State*, 32 Neb. 167; *People v. Wheeler*, 55 N. W. Rep. [Mich.] 371; *Omaha S. R. Co. v. Craig*, 39 Neb. 601; *Haugen v. Chicago, M. & St. P. R. Co.*, 53 N. W. Rep. [S. Dak.] 769.)

References as to degree of skill required and as to liability of physicians and surgeons: *Lynch v. Davis*, 12 How. Pr. [N. Y.] 323; *Carpenter v. Blake*, 60 Barb. [N. Y.] 488; *Dale v. Donaldson*, 48 Ark. 188; *Ballou v. Prescott*, 64 Me. 305; *Potter v. Virgil*, 67 Barb. [N. Y.] 578; *Barbour v. Martin*, 62 Me. 536; *Bemus v. Howard*, 3 Watts [Pa.] 255; *Gates v. Fleischer*, 67 Wis. 504; *Hibbard v. Thompson*, 109 Mass. 286; *Wilmot v. Howard*, 39 Vt. 447; *O'Hara v. Wells*, 14 Neb. 403; *Graves v. Santway*, 6 N. Y. Supp. 892; *Carpenter v. Blake*, 10 Hun [N. Y.] 358; *Becker v. Janinski*, 15 N. Y. Supp. 675.

An error of judgment may be so gross as to be inconsistent with reasonable care, skill, and diligence. (*West v. Martin*, 31 Mo. 375; *Howard v. Grover*, 28 Me. 97.)

Physicians and surgeons engaged in practice as partners are all liable for malpractice by a member of the

firm. (*Hyrne v. Erwin*, 55 Am. Rep. [S. Car.] 15; *Whittaker v. Collins*, 34 Minn. 299.)

*Norval Bros., George W. Lowley, D. C. McKillip*, and *J. L. McPheely, contra:*

Evidence that the physicians stated they would not again visit plaintiff unless requested to do so, that they did not receive such request, and did not revisit him, was admissible under the pleadings. (*Omaha & R. V. R. Co. v. Wright*, 49 Neb. 456; 8 Ency. Pl. & Pr. 218, 226, 250; *Smith v. Phelan*, 40 Neb. 765.)

References as to qualification of jurors and as to correctness of the rulings on challenges: *People v. Thiede*, 39 Pac. Rep. [Utah] 845; *People v. Cotta*, 49 Cal. 168; *People v. Fong Ah Sing*, 70 Cal. 8; *People v. McGonegal*, 32 N. E. Rep. [N. Y.] 616; *Spies v. Illinois*, 123 U. S. 131; *State v. Pike*, 49 N. H. 399; *Scott v. Chope*, 33 Neb. 95; *Basye v. State*, 45 Neb. 261; *Detroit W. T. R. Co. v. Crane*, 50 Mich. 182; *Brumback v. German Nat. Bank*, 46 Neb. 540; *Blenkiron v. State*, 40 Neb. 664; *McLain v. Morse*, 42 Neb. 52; *Van Etten v. Test*, 49 Neb. 725; *Wilcox v. Saunders*, 4 Neb. 570; *Garneau v. Palmer*, 28 Neb. 307.

Text-books on medicine and surgery are not books of science, nor competent as evidence. (*Union P. R. Co. v. Yates*, 79 Fed. Rep. 584; *Collier v. Simpson*, 5 Car. & P. [Eng.] 73; *Ashworth r. Kitridge*, 12 Cush. [Mass.] 193; *Ware v. Ware*, 8 Me. 42; *State v. O'Brien*, 7 R. I. 336; *People v. Hall*, 48 Mich. 482; *Gallagher v. Market Street R. Co.*, 67 Cal. 13; *Epps v. State*, 102 Ind. 539; *Commonwealth v. Wilson*, 1 Gray [Mass.] 337; *Melvin v. Easley*, 1 Jones [N. Car.] 386; *Payson v. Everett*, 12 Minn. 216; *St. Louis, A. & T. R. Co. v. Jones*, 14 S. W. Rep. [Tex.] 309; *People v. Donald*, 12 N. W. Rep. [Mich.] 669; *McKinnon v. Bliss*, 21 N. Y. 210; *Morris v. Harmer*, 7 Pet. [U. S.] 558; *Bogardus v. Trinity Church*, 4 Sand. Ch. [N. Y.] 633; *Missouri v. Kentucky*, 11 Wall. [U. S.] 395; *Boehringer v. Richards Medicine Co.*, 29 S. W. Rep. [Tex.] 508; *City of Bloomington v. Shrock*, 110 Ill. 219.)

RAGAN, C.

On July 4, 1890, Ernest Van Skike, while playing baseball, fractured his kneecap. For negligently treating this wound he sued Drs. Potter & Reynolds in the district court of Seward county for damages. The trial resulted in a verdict and judgment in favor of the doctors, to reverse which the plaintiff below has filed here a petition in error.

1. The first assignment of error is that the verdict is not sustained by sufficient evidence. The undisputed facts in the case are that plaintiff's kneecap was fractured at Cordova, Nebraska. One Dr. Doty was immediately called, dressed the wound, and put the plaintiff's leg in a temporary splint; and he was then taken to Beaver Crossing, which appears to have been his home. That night Dr. Greedy was called to treat the plaintiff's wound. He applied adhesive plasters to the knee, put it in roller bandages and a fracture box, and continued to visit and treat the plaintiff. On July 7 the defendants, with Dr. Greedy and at his request, called to see the plaintiff, and made an examination of the plaintiff's wound, and one of the defendants then expressed the opinion that a necessary, or at least a proper, method of treating the plaintiff's wound would be to make incisions in the skin and flesh of the knee and wire the two pieces of the fractured kneecap together with silver wire. On July 10 the defendants, in company with Dr. Greedy and a man named Evans, visited the plaintiff and performed an operation upon his knee. They subjected the plaintiff to the influence of chloroform, made incisions in the skin and flesh covering the kneecap, exposed the same, drilled holes in the two fractured parts thereof, and wired them together with a silver wire. While one of the defendants was drilling a hole in one of the pieces of the kneecap, a movement of the plaintiff's leg occurred, causing the drill to break, leaving the point thereof in the bone. The broken point of this

drill was, by the defendants, left imbedded in the knee-cap. The defendants visited the plaintiff on July 14, 22, 25, and on August 1, but did not return after the last date. The plaintiff, however, did not recover until after the spring of 1891, at which time other surgeons performed another operation upon his knee. At the time this suit was brought, and at the time the trial occurred, the muscles of the plaintiff's leg and thigh were shrunken, and his knee-joint enlarged and stiff. In other words, the plaintiff appears to be permanently injured, and his claim in this suit is that his permanent injury is the result of the negligent treatment given his wound by the defendants.

Under the assignment that the verdict is not sustained by sufficient evidence a specific argument of the plaintiff is that, in consideration of a certain reward promised the defendants, they undertook and promised not only to treat his fractured knee but to effect a perfect cure thereof, so that he should have as healthy a limb and as perfect use thereof as he had prior to the time the injury occurred. The evidence on the part of the plaintiff tends to sustain his contention. The defendants, however, deny that they entered into any contract with the plaintiff in and by which they guarantied to cure him, and the evidence on their behalf tends to support their theory. We cannot say that the jury's finding that the defendants did not undertake or agree to effect a permanent and complete cure of the plaintiff is unsupported by the evidence.

Another special argument of the plaintiff, under the assignment being considered, is that the defendants undertook and promised the plaintiff after performing the operation upon his knee on July 10 to continue to visit him and treat him until he should recover. The evidence on behalf of the plaintiff tends to sustain this contention. The defendants, however, deny that they made such an agreement, and allege that they made no agreement whatever with the plaintiff as to how often or how

7

long they should visit and treat him, but that they did visit him in connection with Dr. Greedy, examined and treated his wound until and including August 1, at which time they informed the plaintiff that in their opinion he was doing well, and their further visits would be unnecessary, and that they should not return again unless he or Dr. Greedy should request them; and that they were never requested to visit the plaintiff after said August 1. The evidence of the defendants tends to support their contention in this respect, and again we cannot say that the jury's finding in favor of the defendants on this question is not supported by sufficient evidence.

As a part of the assignment under consideration, a third special argument of the plaintiff is that the defendants were guilty of negligence in adopting and pursuing the method of wiring the plaintiff's fractured kneecap together with silver wire; and the finding of the jury that the defendants were not guilty of negligence in adopting and pursuing the method they did lacks evidence to support it. On behalf of the plaintiff numerous physicians and surgeons testified as experts that the method adopted and pursued by the defendants in setting the plaintiff's kneecap—that is, by wiring the fractured portions together—was not the proper method. On the other hand, the defendants themselves and the physicians and surgeons called as experts in their behalf testified that the method adopted and pursued by the defendants in treating the plaintiff's kneecap was a proper and safe one. In other words, as is usual, the experts for the plaintiff agreed with his contention and the experts on behalf of the defendants agreed with their contention. Whether the method adopted and pursued by the defendants was the proper one was a question of fact for the jury, and they, upon conflicting evidence, have acquitted the defendants of negligence in adopting and pursuing the method they did, and we cannot say that they reached the wrong conclusion.

Another special argument is that the finding of the jury that the defendants were not guilty of negligence in leaving the broken drill in the bone lacks evidence to support it. Whether leaving this broken drill in the bone was negligence or not was likewise a question of fact for the jury, and the evidence of the surgeons and experts who testified for the plaintiff tends to show that leaving this broken drill in the bone was not good surgery. The evidence of the defendants on the point under consideration was, in substance, that after the operation of wiring the fractured kneecap was completed the plaintiff was suffering greatly; that the temperature of his body was abnormally high, and his pulse abnormally rapid, and that the knee was highly inflamed; that it was impossible to remove the drill point without breaking the bone; that the drill point as well as all other instruments used in the operation had been antisepticized, and it was the unanimous opinion of all surgeons and physicians who testified in behalf of the defendants that under the circumstances the leaving of the drill point in the bone was proper. We cannot say that the jury was wrong in agreeing with the defendant's theory.

A final special argument, under the assignment that the verdict is not sustained by sufficient evidence, is that the defendants were guilty of negligence in not advising the plaintiff of the fact that the drill had been broken and the point left in the bone of his kneecap. This, like the other questions discussed, was a question of fact for the jury. When the defendants found themselves confronted wth the emergency it was a question of professional judgment whether the plaintiff should be advised of the presence of this drill point in his kneecap. It was undoubtedly the honest opinion of the defendants that the plaintiff would receive no harm from the presence of this drill point in his kneecap, and they may have been of opinion that his ignorance of the presence of the drill point could do him no harm while if he knew the fact his anxiety upon the subject might work him an injury.

The jury have found, and the evidence sustains the finding, that the defendants in keeping the plaintiff ignorant of the presence of the drill point in his kneecap were, in good faith, exercising their best professional judgment, and when they did this they cannot be held, as a matter of law, to have been guilty of negligence, though it afterwards turned out that they were mistaken as to the effect that the drill point in the bone would have upon the plaintiff's knee. The law does not require of a physician or surgeon absolute accuracy either in his practice or his judgment. The law does not hold physicians and surgeons to the standard of infallibility, nor does it require of them the utmost degree of care or skill of which the human mind is capable; but that, while in the practice of their vocation, they shall exercise that degree of knowledge and skill ordinarily possessed by members of their profession. (*O'Hara v. Wells*, 14 Neb. 403; *Hewitt v. Eisenbart*, 36 Neb. 794; *Griswold v. Hutchinson*, 47 Neb. 727.)

2. A second assignment of error is that, on the trial below, the defendants were permitted to prove that they were discharged by the plaintiff from further attendance upon him without such discharge being specially pleaded. After a careful perusal of the entire record we have failed to find that any such an issue as a discharge was presented to the district court or that the defendants were permitted to prove a discharge by the plaintiff. The plaintiff alleged in his petition that he had employed the defendants to treat him until his injury was healed. This allegation the defendants met with a general denial. On the trial the plaintiff introduced evidence which tended to support the allegation of his petition, and the defendants were permitted to deny this and to state at what times they visited the plaintiff, and the last time they visited him, to-wit, August 1, and that they then told the plaintiff that they should not return again unless he or Dr. Greedy, his attending physician, should so request them, and that

after that time they were never requested, either by the plaintiff or Dr. Greedy, to revisit the plaintiff. This evidence was all relevant under the issues made by the pleadings.

3. A third assignment of error relates to the refusal of the district court to permit persons called as jurors to answer on their *voir dire* examination certain questions. The plaintiff's counsel propounded to such persons the following questions: "Do you belong to any religious society? Do you belong to any secret society?" Counsel for the defendants objected to these questions and the court sustained the objections, and it is now insisted that in so doing the court committed an error. To sustain their contention counsel cite us to the following authorities:

*Donovan v. People*, 28 N. E. Rep. [Ill.] 964. In that case the trial judge refused to permit the counsel for the defendant to subject the persons called as jurors to any examination whatever, saying: "Except you examine the jurors for cause through the mouth of the court you cannot examine them at all." The case cited is not in point.

Another case is *Lavin v. People*, 69 Ill. 303. Counsel for the defendant in that case asked the persons called as jurors on their *voir dire* whether they were members of a temperance society or connected with any society or league organized for the purpose of carrying on prosecutions under the temperance laws of the state. The defendant was about to be put on trial under an indictment charging him with selling intoxicating liquors contrary to the statutes of the state, and the supreme court held, and we think properly, that the district court erred in refusing to permit the question asked to be answered.

Another case cited is *Pearcy v. Michigan Mutual Life Ins. Co.*, 12 N. E. Rep. [Ind.] 98. This was a suit upon a life insurance policy, and one of the persons called as a juror was asked on his *voir dire* whether he held a policy issued by the defendant company, and answered "No."

It afterwards turned out that the juror had insured his life in the defendant company for the benefit of his wife, and the court held that the defeated party by reason of this false answer of the juror was entitled to a new trial.

Another case cited is *People v. Wheeler*, 55 N. W. Rep. [Mich.] 371. In this case the people prosecuted Wheeler for keeping a saloon open on Sunday, and a juror testified on his *voir dire* that he had always been "down on liquor selling," and that when sitting as a juror in a case where a liquor seller was interested as a defendant or a witness he had a prejudice against such person. Wheeler then challenged this juror for cause. The trial court overruled the challenge and the supreme court reversed the judgment for that reason.

We are unable to see that these cases are authority for the contention of the plaintiff here. In this case was involved, neither directly nor indirectly, any religious or secret society, and we are unable to understand what useful or just purpose of the plaintiff could have been subserved by permitting the jurors to state whether or not they were members of a church organization or a secret society. It is true that a litigant has the right to examine a person called as a juror for the purpose of ascertaining whether or not there exists grounds for challenging such person for cause. But what questions may be asked such a person, or what range or scope such an examination may take, is a matter committed to the sound discretion of the trial judge. No rule can be laid down that would be a safe guide in all cases; and the scope of such an examination, and the pertinency of the questions propounded, are to be determined from the nature of the case on trial. (*Basye v. State*, 45 Neb. 261.) We must not be understood as holding that in no case is it proper to ask a juror on his *voir dire* whether he belongs to a church organization or a secret society. All we decide here is that the district court did not abuse its discretion in this case in refusing to permit the per-

sons called as jurors to state whether they belonged to any secret society or church organization.

4. Another assignment of error argued relates to the action of the district court in overruling a challenge for cause submitted by the plaintiff to one Fuller who was called and examined as a juror, the contention of the plaintiff being that Fuller's examination disclosed that he was biased or prejudiced in favor of the defendants. Fuller stated that he was a married man having a wife and one child; that he was then, and had been for ten years, residing on a farm in Seward county; that he was acquainted with the defendants, but not with the plaintiff; that he was not present at the former trial of this case; that he had heard something about the case from parties who were present at the former trial; that these parties pretended to relate the facts to some extent; that from what he had heard he had not formed or expressed any opinion as to the merits of the case; that the facts related to him made no impression upon his mind, and would not influence his verdict in the present trial; that one of the defendants had been his family physician before his, Fuller's, marriage. The other had been his physician since he was married, but neither of the defendants was his physician at this time. He was then asked by plaintiff's counsel this question:

Would the fact that Dr. Reynolds has been your family physician, and Dr. Potter since you were married, have any effect upon you, if you sit as a juror in this case?

A. It might.

Q. If, after you had all the evidence, the fact of your acquaintanceship with them might be overcome by the same, might it not?

A. It might; yes.

The plaintiff's counsel then challenged the juror for cause. The challenge was resisted by the defendants and their counsel propounded to him the following questions:

Q. Notwithstanding this statement that you have heard, you have formed or expressed no opinion?

A. I have expressed no opinion.

Q. Formed no opinion?

A. I don't think I have formed any opinion.

Q. Have you any opinion now as to the rights of the parties?

A. No; I have not.

Q. Have you any bias or prejudice for or against either of the parties?

A. No; I have not.

Q. Notwithstanding your acquaintance with the defendants in this action, can you render a fair and impartial verdict upon the evidence (the testimony) of the court?

A. I believe I could.

Q. And the fact that you are acquainted with Drs. Reynolds & Potter and that you have employed them in your family, would not interfere with your rendering a fair and impartial verdict on the evidence, would it?

A. Well, I don't hardly believe it would. I believe I said once that it might, but I don't believe it would.

At this point the court took the juror in hand and the following occurred:

Q. You say they are your family physicians at this time?

A. They are not.

Q. How long since either of them was employed by you?

A. About eighteen months.

Q. Have they or either of them been employed frequently by you in your family?

A. Up to that time all the medical assistance we needed.

Q. Your relations were very friendly with them?

A. Yes, sir.

Q. Well, now, what do you say? Would the fact that they have been your family physicians,—would that fact

of your relations with them,—have any influence on your verdict in this case?

A. I believe not.

And thereupon the court overruled the challenge. We do not think the examination of this juror disclosed that he was biased or prejudiced either against the plaintiff or in favor of the defendants, and therefore we think the court did not err in overruling the challenge.

5. On the trial the plaintiff offered in evidence extracts from certain standard text-books on surgery. These offers of evidence the district court excluded, and this ruling is the next assignment of error argued. These text-books were offered "for the purpose of showing the practice of reducing fractures of the patella,— simple transverse fractures,"—"and for the purpose of showing that the authors of the books offered in evidence condemn the practice of wiring, and that it should never be resorted to except in cases where the chances of life are equal to that of death, that it is dangerous, and that the results following in the greater portion, and in far more than a majority of the cases, have proved fatally, and of very bad results." It is to be noted that these text-books were offered for the purpose of showing that in the opinion of their authors the wiring of a fractured kneecap was not good surgery. They were not offered for the purpose of fortifying an opinion which had been expressed by an expert upon the witness stand and whose opinion was predicated upon the text-books offered, nor were they offered for the purpose of showing that they contradicted the opinion expressed by such expert. But they were offered as independent evidence to sustain the plaintiff's contention that the wiring of the fractured kneecap by the defendants was not good surgery and therefore negligence. Was this evidence competent? We think that the great weight of authority, both English and American, is to the effect that text-books on surgery, though standard authority, are not competent, independent evidence.

In *Union P. R. Co. v. Yates*, 79 Fed. Rep. 584, it was distinctly held that medical books could not be read to the jury as independent evidence of the opinions therein expressed. The opinion is by Thayer, circuit judge, and, like all that eminent jurist's opinions, it is an able and exhaustive one. Most, if not all, the authorities on the question are cited and reviewed; and we cannot better express our own views on the subject under consideration than to quote that opinion. The learned judge said: "The authorities, both English and American, are practically unanimous in holding that medical books, even if they are regarded as authoritative, cannot be read to the jury as independent evidence of the opinions and theories therein expressed or advocated. One objection to such testimony is that it is not delivered under oath; a second objection is that the opposite party is thereby deprived of the benefit of a cross-examination; and a third and perhaps a more important reason for rejecting such testimony is that the science of medicine is not an exact science. There are different schools of medicine, the members of which entertain widely different views, and it frequently happens that medical practitioners belonging to the same school will disagree as to the cause of a particular disease, or as to the nature of an ailment with which a patient is afflicted, even if they do not differ as to the mode of treatment. Besides, medical theories, unlike the truths of exact science, are subject to frequent modification and change, even if they are not altogether abandoned. For these reasons it is very generally held that when, in a judicial proceeding, it becomes necessary to invoke the aid of medical experts it is safer to rely on the testimony of competent witnesses who are produced, sworn, and subjected to a cross-examination, than to permit medical books or pamphlets to be read to the jury." We cheerfully yield to this case as authority. But it is said in this connection that this evidence was admissible by virtue of section 342, Code of Civil Procedure of this state, which

provides that "historical works, books of science or art, and published maps or charts when made by persons indifferent between the parties are presumptive evidence of facts of general notoriety and interest." This is the exact language of section 1906 of the Code of Civil Procedure of the state of California, and in *Gallagher v. Market Street R. Co.*, 6 Pac. Rep. 869, this provision of the Code was construed, and it was held that, by the adoption of this section of the Code, the legislature intended to extend the common-law rule of evidence rather than restrict it, but that the extension was limited by the phrase "facts of general notoriety and interest." The court said: "What are facts of general notoriety and interest? We think the terms stand for facts of a public nature, either at home or abroad, not existing in the memory of men, as contradistinguished from facts of a private nature, existing within the knowledge of living men, and as to which they may be examined as witnesses. It is of such public facts, including historical facts, facts of the exact sciences, and of literature or art, when relevant to a cause, that, under the provisions of the Code, proof may be made by the production of books of standard authority.    *    *    *    But medicine is not considered as one of the exact sciences. It is of that character of inductive sciences which are based on data which each successive year may correct and expand so that what is considered a sound induction last year may be considered an unsound one this year, and the very book which evidences the induction, if it does not become obsolete, may be altered in material features from edition to edition, so that we cannot tell, in citing from even a living author, whether what we read is not something that this very author now rejects." We conclude, therefore, that textbooks on surgery, though of standard authority, are not competent evidence except as to matters of general notoriety or interest within the meaning of said section 342 of our Code.

6. A final assignment of error argued relates to the

action of the district court in giving and refusing to give certain instructions. The charge of the court is quite lengthy, and it seems ·to have been prepared with great care, and correctly laid down the law applicable to the facts in evidence in the case on trial. It would subserve no useful purpose to set out the instructions about which complaint is made; and it must suffice to say that after a careful examination of the record we are of opinion that no error, of which the plaintiff has a right to complain, was committed by the district court either in giving or refusing to give instructions. The judgment of the district court must be and is :

AFFIRMED.

NORVAL, J., not sitting.